Good morning, Your Honors. I'm Patricia Spratt. I'm here this morning with my partner, Brian Crowe, and together we represent Guaranty Nat'l Title, the plaintiff appellant in this matter. And also, this is a recording device, not a microphone, so you'll have to compete with the outside. Keep your voice up, please. I'm good at competing. Your Honor, we're here this morning really to ask you to consider two overarching issues and reverse the trial court. And those issues are whether Mr. Dimucci is liable under a personal undertaking that he gave to my client, Guaranty Nat'l, regarding a mechanics lien claim and whether the assignment of the judgment, ultimately to my client, by that assignment puts my client in the shoes of Fidelity, to whom the undertaking was given. Fidelity is also a title insurance company and we are its, Guaranty is its agent. We understand that we have a tough task here because the standard is the manifest weight of the evidence. And if the evidence is against the manifest weight, if an opposite result is clearly evident. And in this case, I think from the evidence, that opposite result is clearly evident. The first piece of evidence to discuss is the undertaking itself. We have competing testimony regarding the undertaking. We have Mr. Farber, who is an agent of Guaranty, who said that he insisted he needed a personal undertaking on the occasion of the SOJ refi, which is the first policy that Guaranty issued, because of the existence of the mechanics lien. He said he prepared a form and he faxed it to Mr. Dimucci after Mr. Dimucci ultimately agreed to give a personal guarantee, personal undertaking. And he received back from Mr. Dimucci that same form with his signature. The two difference in that form that he received back was it was signed and it was dated. Mr. Farber said he's been in at least 20 real estate closings with Mr. Dimucci in the past. In those closings, he has witnessed Mr. Dimucci sign multiple documents. He's also received multiple faxes back from Mr. Dimucci with his signature. He knows his signature and that was his signature on the personal undertaking. Mr. Dimucci, in contrast, said in his testimony, it looked like his handwriting, but he didn't recall signing it. That's the sum of the evidence. The trial judge said, in concluding that the defendant had the better side of the case, the trial judge said maybe Mr. Dimucci's testimony was coy, that Mr. Farber had the best evidence regarding who signed that document, but because nobody saw Mr. Dimucci signed the document, and because the trial judge had his own comparison of other documents that Mr. Dimucci. He also said that he put his title after his signature in other documents, is that correct? He did. On all the other undertakings in the file, and that would be Plaintiff's Exhibits 13 and 32, Mr. Dimucci signed in a corporate capacity. And Mr. Farber explained that those two documents. And also something about a third item, a fax number as well, is that correct? Well, Mr. Farber is not familiar with the fax numbers, so that he couldn't say where that fax came from is really not suspicious. He doesn't know offhand the fax telephone number of the machine that was sending it to him. I'm hopeful that you have a personal understanding of fax machines and would understand that when you receive a fax and there's a header, you may not always be knowing. I'm just saying that that was one of the elements which the court also took into consideration. He did. He did. In determining whether or not that was Mr. Dimucci's signature. But as to the GAP undertakings that Mr. Dimucci signed in a corporate capacity, Mr. Farber explained in his testimony that a GAP undertaking is an undertaking that a party who is selling property gives to cover that short period of time, up to perhaps a month, between when a title commitment is given and when a sale closes. Because there's a lapse there between when events occur that might create a cloud on title and when they might show up. So to cover that, they give a GAP undertaking. And if you look at those GAP undertakings, they're really very general in nature. They just say for this time period. The undertaking here that we're seeking to enforce, the personal undertaking that Mr. Farber said he insisted on, consistently his testimony says personal undertaking. This is an undertaking against a specific cloud. The United Painters Mechanics Lien and Foreclosure Judgment. For that reason, Mr. Farber insisted on a personal guarantee. So that the trial judge was, he made the conclusion that because that signature was not in a corporate capacity, it was not Mr. Dimucci's signature. I think the weight of the evidence here, the fact that Mr. Farber knows that signature, that Mr. Farber received the facts back and he's familiar with the facts signature, that Mr. Dimucci doesn't recall signing it. He doesn't flat out say I never signed it and I never would have signed it and I would not have given a personal undertaking. He simply says it looks like my handwriting, but I don't recall signing it. The affirmative evidence from Mr. Farber and the negative evidence from Mr. Dimucci, when weighed together, the greater weight of the evidence is in favor of our side in that Mr. Dimucci absolutely executed that personal undertaking and is liable for it. But does that meet the standard? Well, the standard is the opposite, you know. Conclusion, clearly, exactly. When you're looking at affirmative evidence, people who have testimony and have documents, and you weigh that against people who have no affirmative evidence, but simply say, didn't happen, or I don't, he didn't even say that, he says I don't recall. I think the greater weight of that evidence clearly requires that the case be reversed and remanded, or in this case, this court can enter judgment since it was a bench trial. As to the other document, if the court is not convinced that just the evidence regarding the undertaking alone is sufficient to require reversal, then we look to the other documentary evidence. In there we include the undertaking, but we can look to all of the letters, the three letters that Mr. Rothstein sent and the letter that Mr. Vogel sent, four letters in February and March of 2004. Each time each one of those letters was sent, each one of the parties who sent it, Mr. Vogel or Mr. Farber, again offered affirmative evidence. We sent this, we sent this in this way, and we didn't get a response. Mr. Dimucci, on under adverse examination, that he didn't recall receiving any one of three of the letters and the fourth letter he claimed was a fabrication. But when he's examined by his own counsel, he says, well, a year earlier, Fidelity, who we are the assuring agent for, Fidelity's lawyers told my lawyers that I had nothing to worry about, I wasn't liable for anything, so I just disregarded them. So he's presenting conflicting testimony himself. First he says, I don't recall them, then he says, I didn't feel I had to respond to them. Now what business person, and Mr. Dimucci says he's been in the real estate business for 20 years, I don't know a business person who would let a self-serving letter go to the wrong person.